# EXHIBIT  2

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

In the matter of the Life )
Term Parole Consideration )    CDC Number D-55450
Hearing of: )
)
KENNETH LUTHER )
_____)

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

MAY 23, 2005

PANEL PRESENT:

SUSAN FISHER, Presiding Commissioner
ROBERT HARMON, Deputy Commissioner

OTHERS PRESENT:

KENNETH LUTHER, Inmate
PAT FOX, Attorney for Inmate
CELIA ROWLAND, Deputy District Attorney
NORMA VOMVOLAKIS, Victim's Next of Kin
NICK VOMVOLAKIS, Victim's Next of Kin
CHRIS VOMVOLAKIS, Victim's Next of Kin
SHELLY FITZSIMMONS, Victim's Next of Kin Support
JOHN BARNES, Victim Services Coordinator
JEFF ROSELL, Observer

CORRECTIONS TO THE DECISION HAVE BEEN MADE

```
_____    No        See Review of Hearing
_____    Yes       Transcript Memorandum
```

**Tamyra Morgan**          **Capitol Electronic Reporting**

ii

## INDEX

Page

Proceedings........................................ 1

Case Factors.....................................12

Pre-Commitment Factors...........................17

Post-Commitment Factors..........................28

Parole Plans.....................................24

Closing Statements...............................56

Recess...........................................70

Decision.........................................71

Adjournment......................................75

Transcriber Certification........................76

--oOo--

1

1         **P R O C E E D I N G S**

2         **DEPUTY COMMISSIONER HARMON:**  We're on

3    record.

4         **PRESIDING COMMISSIONER FISHER:**  Good

5    afternoon, Mr. Luther.  All right this is going to

6    be a parole -- Subsequent Parole Consideration

7    Hearing for Kenneth Luther, CDC number D-55450.

8    Total's date is 5/23/05, and we're located at the

9    California (sic) Training Facility at Soledad.

10   The inmate was received on 5/4/87, from Santa Cruz

11   County.  The life term began on 12/26/88, and the

12   Minimum Eligible Parole Date is 12/11/98.  The

13   controlling offense for which the inmate has been

14   committed is second-degree murder, case number

15   0355.  Count one, Penal Code Section 187.  There

16   was an additional finding of the use of a firearm,

17   Penal Code Section 12022.5, and count two, Penal

18   Code Section 496, receiving stolen property.  The

19   inmate received a term of 15 years to life plus

20   four years and once again, the Minimum Eligible

21   Parole Date is 12/11/98.  And, Mr. Luther, we are

22   going to be tape recording today.  So for the

23   purpose of voice identification, we're each going

24   to say our first and last name and spell our last.

25   When I get to you, I need your CDC number.  All

26   right.  I'm going to start with myself and go to

27   my left.  Susan Fisher, F-I-S-H-E-R, Commissioner.

2

1          **DEPUTY COMMISSIONER HARMON:**  Robert Harmon,

2   H-A-R-M-O-N, Deputy Commissioner.

3          **PRESIDING COMMISSIONER FISHER:**  Go ahead.

4          **MS. VOMVOLAKIS:**  Norma Vomvolakis, mother of

5   Joseph.

6          **MR. NICK VOMVOLAKIS:**  Nick Vomvolakis,

7   father of Joseph.

8          **MS. FITZSIMMONS:**  Shelly Fitzsimmons,

9   (indiscernible).

10          **MR. CHRIS VOMVOLAKIS:**  Chris Vomvolakis,

11   Joe's brother.

12          **DEPUTY DISTRICT ATTORNEY ROWLAND:**  Celia

13   Rowland, R-O-W-L-A-N-D, with the District

14   Attorney's Office in Santa Cruz.

15          **MR. BARNES:**  John Barnes, B-A-R-N-E-S,

16   Correctional Counselor, Victim Services

17   Coordinator.

18          **ATTORNEY FOX:**  Pat Fox, F-O-X, attorney for

19   Mr. Luther.

20          **INMATE LUTHER:**  Kenneth E. Luther, Junior,

21   D-55450.

22          **ATTORNEY FOX:**  Okay.  You need to spell your

23   last name.

24          **DEPUTY DISTRICT ATTORNEY FOX:**  Jeff Rosell,

25   from the Santa Cruz District Attorney's Office,

26   R-O-S-E-L-L.

27          **ATTORNEY FOX:**  I don't think Mr. Luther

3

1    spelled his last name.

2         **PRESIDING COMMISSIONER FISHER:**  I'm sorry,

3    go ahead.

4         **ATTORNEY FOX:**  Just to be consistent.

5         **PRESIDING COMMISSIONER FISHER:**  Mr. Luther,

6    if you would please do that?

7         **INMATE LUTHER:**  L-U-T-H-E-R.

8         **PRESIDING COMMISSIONER FISHER:**  Okay.  Thank

9    you.  I'd like to also note for the record that we

10   have two correctional officers present in the room

11   who are here for security purposes only and will

12   not be participating in the hearing.  And,

13   Mr. Luther, before I can move on, I need to ask

14   you to read that American's with Disabilities Act

15   that's there on the table in front of you.  If you

16   would just read it out loud for us into the

17   record, please?

18        **INMATE LUTHER:**  ADA, Americans with

19   Disabilities Act.

20            "The Americans with Disabilities Act,

21            ADA, is a law to help people with

22            disabilities.  Disabilities are

23            problems that make it harder for some

24            people to see, hear, breathe, talk,

25            walk, learn, think, work, or take

26            care of themselves than it is for

27            others.  Nobody can be kept out of

4

1          public places or activities because

2          of the disability.  If you have a

3          disability, you have the right to ask

4          for help to get ready for your BPT

5          hearing, to get to the hearing, talk,

6          read forms and papers, and understand

7          the hearing process.  BPT will look

8          at what you asked for to make sure

9          that you have a disability that it is

10         covered by the ADA and that you have

11         asked for the right kind of help.  If

12         you do not get the help or if you

13         don't think you got the kind of help

14         you need, ask for the BPT 1074

15         Grievance Form.  You can also get

16         help to fill it out."

17         **PRESIDING COMMISSIONER FISHER:**  Thank you.

18  Do you understand that?

19         **INMATE LUTHER:**  Yes, Ma'am.

20         **PRESIDING COMMISSIONER FISHER:**  Okay.  I do

21  want to note for the record that on 10/14/04,

22  Mr. Luther did sign a BPT 1073 Form and stated

23  that he has no disabilities.  I have some

24  questions that I have to ask you related to that

25  before we can go forward.  Do you have any

26  problems walking up and down stairs or walking

27  distances?

1    **INMATE LUTHER:** No, Ma'am.

2    **PRESIDING COMMISSIONER FISHER:** Okay. Are

3 those reading glasses?

4    **INMATE LUTHER:** Yes, Ma'am.

5 Well, no, they're for seeing. I'm nearsighted.

6    **PRESIDING COMMISSIONER FISHER:** Okay. All

7 right. So they don't affect your ability to read?

8    **INMATE LUTHER:** They allow me to see. I

9 mean --

10    **PRESIDING COMMISSIONER FISHER:** Just in

11 general.

12    **INMATE LUTHER:** Yeah.

13    **PRESIDING COMMISSIONER FISHER:** Okay. All

14 right. Did you do an Olson Review on your file?

15    **INMATE LUTHER:** Yes, I did.

16    **PRESIDING COMMISSIONER FISHER:** And did you

17 have your glasses available?

18    **INMATE LUTHER:** Yes, I did.

19    **PRESIDING COMMISSIONER FISHER:** Okay. Do

20 you have any hearing impairments?

21    **INMATE LUTHER:** No, Ma'am.

22    **PRESIDING COMMISSIONER FISHER:** Okay. Ever

23 been included in the Triple CMS or EOP Programs?

24    **INMATE LUTHER:** No, Ma'am.

25    **PRESIDING COMMISSIONER FISHER:** And prior to

26 coming to prison for this offense, how far did you

27 get in school?

6

1          **INMATE LUTHER:**  I dropped out my sophomore

2     year of high school.

3          **PRESIDING COMMISSIONER FISHER:**  Okay.  Is

4     there any disability that you have that you

5     believe would prevent you from being able to

6     participate in the hearing today?

7          **INMATE LUTHER:**  No, Ma'am.

8          **PRESIDING COMMISSIONER FISHER:**  Okay.  Thank

9     you.  This hearing is being conducted pursuant to

10    Penal Code Sections 3041 and 3042 and the rules

11    and regulations of the Board of Prison Terms that

12    govern parole consideration hearings for life

13    inmates.  And as you know, the purpose of the

14    hearing today is to consider again your commitment

15    offense, your prior criminal and social history,

16    and your behavior and programming since you've

17    been in prison for this offense.  We have had the

18    opportunity to review your file, and we'll give

19    you the opportunity to make any corrections that

20    you need to today.

21          **INMATE LUTHER:**  Okay.

22          **PRESIDING COMMISSIONER FISHER:**  All right.

23    We're going to be reaching a decision today as to

24    whether or not we find you suitable for parole.

25    And if we do find you suitable today, we'll

26    explain to you today what the length of your

27    confinement will be.

1      **INMATE LUTHER:** Okay. Before we recess to

2   deliberate, I'm going to give you and your

3   attorney, as well as the District Attorney, the

4   opportunity to make a final statement about your

5   suitability. Once you finish doing that, I'm also

6   going to allow the members of the victim's family

7   who would like to speak to make their statement.

8   I want to remind you that you're not required

9   today to admit or discuss the offense but that the

10  Panel accepts the findings of the court to be

11  true. Do you understand that?

12      **INMATE LUTHER:** Yes, Ma'am.

13      **PRESIDING COMMISSIONER FISHER:** Okay. All

14  right. The California Code of Regulations states

15  that, regardless of time served, a life inmate

16  shall be found unsuitable for and denied parole if

17  in the judgment of the Panel he would pose an

18  unreasonable risk of danger to society if released

19  from prison. You have rights related to this

20  hearing that include the right to timely notice of

21  the hearing, the right to review your Central

22  File, and the right to present relevant documents.

23  Counsel, have your client's rights been met?

24      **ATTORNEY FOX:** Yes, they have as to this

25  hearing.

26      **PRESIDING COMMISSIONER FISHER:** Thank you.

27  You also have the right, Mr. Luther, to an

8

1  impartial Panel.  Having seen your Panel members

2  today, do you have any objections to your Panel?

3       INMATE LUTHER:  No, Ma'am.

4       PRESIDING COMMISSIONER FISHER:  Okay.

5  Counsel, any objections to the Panel?

6       ATTORNEY FOX:  No, no objections.

7       PRESIDING COMMISSIONER FISHER:  All right.

8  I'm going to give you a written copy of our

9  decision today.  It will be a tentative and will

10  be effective within 120 days, and then a copy of

11  the decision and a copy of the transcript of your

12  hearing will be sent to you.  Now in May of last

13  year, they changed the manner in which you appeal

14  Board decisions.  And since that time, all appeals

15  go directly to the courts.  So if you need

16  additional information about that, your

17  correctional counselor would have it, also it

18  should be in the prison library.  All right?

19       INMATE LUTHER:  Okay.

20       PRESIDING COMMISSIONER FISHER:  Is there any

21  confidential to use today?

22       DEPUTY COMMISSIONER HARMON:  Well, we have

23  several letters or confidential letters from

24  family members --

25       PRESIDING COMMISSIONER FISHER:  Okay.

26       DEPUTY COMMISSIONER HARMON:  -- opposing

27  parole and I believe --

9

1          **PRESIDING COMMISSIONER FISHER:**  So we may be

2   using it?

3          **DEPUTY COMMISSIONER HARMON:**  I know a couple

4   of the writers are here so.

5          **PRESIDING COMMISSIONER FISHER:**  All right.

6   So we may consider them.

7          **ATTORNEY FOX:**  In the event any confidential

8   information is considered, I'd object to it based

9   on due process grounds.

10          **PRESIDING COMMISSIONER FISHER:**  Okay.

11          **ATTORNEY FOX:**  Thank you.

12          **PRESIDING COMMISSIONER FISHER:**  And I will

13   -- I don't know if we're going to be considering

14   it.  If we make that decision, we'll let you know

15   later in the hearing.  But as you know, we are

16   charged to consider all information received from

17   the public, so we will be considering that if feel

18   that it's important to do so.

19          **ATTORNEY FOX:**  Thank you.

20          **DEPUTY COMMISSIONER HARMON:**  Do you have all

21   the items on the checklist?

22          **ATTORNEY FOX:**  Yes, I do.

23          **PRESIDING COMMISSIONER FISHER:**  Okay.  Thank

24   you.  If you could just check that against your

25   Board packet and make sure that you have all the

26   information that's indicated in my file.

27          **ATTORNEY FOX:**  Additionally, I received

10

1   other documents today, which I will object to, the

2   (indiscernible).

3        **PRESIDING COMMISSIONER FISHER:**  Is that the

4   letter from the --

5        **ATTORNEY FOX:**  There's a letter from the

6   office of the District Attorney and then a letter,

7   which perhaps should be in the confidential file

8   dated May 1st.  We will, however, not object to the

9   laudatory chrono.

10       **PRESIDING COMMISSIONER FISHER:**  Okay.  And

11  we will not consider the letters that were not

12  received in a timely manner.

13       **ATTORNEY FOX:**  Do you have --

14       **DEPUTY DISTRICT ATTORNEY ROWLAND:**  I have a

15  question.  Does that include the one from Sergeant

16  Mario with the San Cruz Sheriff's Department?  I

17  guess that was not in my packet.

18       **PRESIDING COMMISSIONER FISHER:**  Let's see.

19  I don't have a letter from him here.  Should there

20  be one in the Board packet?

21       **DEPUTY DISTRICT ATTORNEY ROWLAND:**  I would

22  have been submitted after I received this, so I

23  don't know that it would have made it into the

24  Board packet.

25       **PRESIDING COMMISSIONER FISHER:**  Okay.  I

26  don't see it at all.

27       **DEPUTY DISTRICT ATTORNEY ROWLAND:**  Okay.

11

1      **PRESIDING COMMISSIONER FISHER:**  And I

2  haven't seen it as I went through Mr. Luther's

3  letters.  Thank you.  So I don't believe we have

4  it.

5      **DEPUTY DISTRICT ATTORNEY ROWLAND:**  I don't

6  see it.

7      **PRESIDING COMMISSIONER FISHER:**  I don't

8  either.  All right.  Is there anything that needs

9  to be submitted?

10     **ATTORNEY FOX:**  No, that's it for now.

11     **PRESIDING COMMISSIONER FISHER:**  Okay.  Any

12  preliminary objections?

13     **ATTORNEY FOX:**  No.  Thank you.

14     **PRESIDING COMMISSIONER FISHER:**  And is

15  Mr. Luther going to be speaking with us?

16     **ATTORNEY FOX:**  Yes, he will.

17     **PRESIDING COMMISSIONER FISHER:**  Okay.

18  Mr. Luther, if you will raise your right hand, I'm

19  going to swear you in.  Do you solemnly swear or

20  affirm that the testimony you give at this hearing

21  will be the truth and nothing but the truth?

22     **INMATE LUTHER:**  Yes, Ma'am.

23     **PRESIDING COMMISSIONER FISHER:**  All right.

24  Thank you.  All right.  Mr. Luther, what I'm going

25  to do is read a summary of the crime into the

26  record, and then I'm going to ask you to tell me

27  if you agree with it.  And then I'm probably going

12

1    to ask you to elaborate a little bit.  All right.

2    Counsel, I'm using the summary from the probation

3    officer's report if you have no objections.

4         **ATTORNEY FOX:**  I'd object to using the

5    probation officer's report for the Statement of

6    Facts simply because it's based on hearsay.

7         **PRESIDING COMMISSIONER FISHER:**  Okay.  Let's

8    see here.  Well, the current Board report I think

9    is based on the probation officer's report.  Let's

10   see.

11        **ATTORNEY FOX:**  I think it is based on the

12   probation officer's report.

13        **PRESIDING COMMISSIONER FISHER:**  Well,

14   between the -- We have to read the Statement of

15   Facts into record so between the two, do you have

16   a preference?

17        **ATTORNEY FOX:**  I have no preference.  I'm

18   faced with a Hobson's choice.

19        **PRESIDING COMMISSIONER FISHER:**  I can see

20   that.  Well, what I'm going to do is ask

21   Mr. Luther to tell me if he agrees with what I

22   read so he can -- Anything that he disagrees with

23   we'll get on the record also.  So we'll use the

24   Board report and that is under Summary of the

25   Crime, it's the February 2005 Calendar.  It reads:

26            "On May 10, 1986, at approximately

27            1:40 a.m., Kenneth Luther attempted

13

1       to steal a stereo from the Jeep

2       belonging to Stacey Hine, that's

3       H-I-N-E, which was parked in front of

4       her parent's residence.  During the

5       attempted theft, Luther was observed

6       and perceived by Stacey Hine's --

7       Stacey Hine's boyfriend, I'm sorry,

8       Joseph Vomvolakis, the victim.

9       Joseph happened to be leaving the

10      residence at the time of the theft.

11      Stacey Hine stated that shortly after

12      Joseph had left the residence, she

13      heard three gunshots.  While she

14      called the Sheriff's office, she

15      asked her brother Martin to check out

16      what had happened.  Simultaneously, a

17      Sheriff's Deputy reported to the

18      location of a man down, later

19      identified as Joseph Vomvolakis.

20      Joseph had suffered two gunshot

21      wounds from a .25 caliber automatic

22      weapon.  Both wounds, one to the

23      abdomen and the other to the head,

24      would have by themselves caused

25      death.  The deputies canvassed the

26      area and went to a nearby motel where

27      they interviewed Luther.

14

1        Fingerprints were matched to Luther

2        from a beer can and a knife found

3        near the Jeep.  Upon cross-

4        examination, Luther told the deputies

5        where the gun was located.  He had

6        admitted that he had stolen the gun

7        -- I'm sorry.  He admitted that he

8        had stolen the gun a few weeks prior

9        to the shooting.  A gun and

10       screwdriver were retrieved by

11       deputies from a nearby field."

12   All right.  So, Mr. Luther, do you agree with what

13   I read?

14            **INMATE LUTHER:**  Yes.

15            **DEPUTY COMMISSIONER HARMON:**  I need you to

16   speak up, sir.

17            **INMATE LUTHER:**  Yes, Ma'am.

18            **PRESIDING COMMISSIONER FISHER:**  We need to

19   make sure that you -- that your voice is on the

20   tape.  All right.  So just fill me in a little

21   bit.  You were trying to steal a stereo?

22            **INMATE LUTHER:**  Yes, Ma'am.

23            **PRESIDING COMMISSIONER FISHER:**  Okay.  And

24   why were you armed?

25            **INMATE LUTHER:**  It's pure stupidity.

26            **PRESIDING COMMISSIONER FISHER:**  Was it your

27   gun?

15

1     **INMATE LUTHER:** Well, I stole it. I stole

2    it from a business acquaintance, somebody I had

3    been doing work for.

4     **PRESIDING COMMISSIONER FISHER:** Okay. And

5    were you working at the time? Did you have a

6    regular job at the time?

7     **INMATE LUTHER:** Yeah, I was on vacation at

8    the time.

9     **PRESIDING COMMISSIONER FISHER:** Okay. So

10   why -- If you had a job, what were you doing

11   stealing stereos?

12    **INMATE LUTHER:** I just -- Because of my

13   prior history of drugs and the way I had treated

14   people. I had false sense of somebody, you know.

15   It was like a paranoia, I guess you could say,

16   because of the drugs that I was using at the time.

17   You know even if it might have been, like I said,

18   a false sense, I still had a paranoia that

19   somebody was out to get me.

20    **PRESIDING COMMISSIONER FISHER:** That still

21   doesn't make sense why you would -- why that would

22   lead you to steal a stereo.

23    **INMATE LUTHER:** That was to support my drug

24   habit.

25    **PRESIDING COMMISSIONER FISHER:** Okay. All

26   right. Is there anything that we didn't cover in

27   reading the summary of the facts about what

16

1   happened that evening that you think would be

2   important for us to know?

3        **INMATE LUTHER:**  No, Ma'am.

4        **PRESIDING COMMISSIONER FISHER:**  All right.

5   So what happened when you and Joseph -- when he

6   confronted you?  How did things transpire at that

7   point?

8        **INMATE LUTHER:**  There was no confrontation.

9   I never even knew that I had shot him when I fired

10  the gun.

11       **PRESIDING COMMISSIONER FISHER:**  What were

12  you shooting at?

13       **INMATE LUTHER:**  My impression was because I

14  grew up in the area was that I was firing at a

15  dirt bank and I never intended to shoot him.  You

16  know I'm not here to, you know, argue the facts of

17  what happened or what I was convicted of because

18  when -- to this day, I have, you know, an

19  impression of the way I felt of exactly how things

20  happened.  I can't tell exactly how things

21  happened, you know.

22       **PRESIDING COMMISSIONER FISHER:**  Okay.

23       **INMATE LUTHER:**  Because it happened so

24  quickly.  And like I said, I had no idea that I

25  had even shot him, you know.

26       **PRESIDING COMMISSIONER FISHER:**  Okay.

27       **INMATE LUTHER:**  Until the next day.

17

1      **PRESIDING COMMISSIONER FISHER:**  If you

2  weren't shooting at him or even shooting to scare

3  him or whatever, why were you shooting the gun?

4      **INMATE LUTHER:**  So that he would stop

5  chasing me.

6      **PRESIDING COMMISSIONER FISHER:**  Okay.  Was

7  he in the general vicinity of where you were

8  firing?

9      **INMATE LUTHER:**  I don't know because at the

10  time of when I fired, as I have stated before, was

11  I didn't know if I had tripped or if he ran into

12  me.  All I know is I was going down to the ground

13  and at that point was about the same time that I

14  was going to fire the gun.  And so I had no idea

15  where I was firing.  I just, you know, in panic I

16  guess.  I don't know, you know.

17      **PRESIDING COMMISSIONER FISHER:**  Okay.  How

18  did you get to the area where you were stealing

19  the stereo?  Were you on foot?

20      **INMATE LUTHER:**  Yes.

21      **PRESIDING COMMISSIONER FISHER:**  Okay.  All

22  right.  Anything that we didn't cover?

23      **INMATE LUTHER:**  No.

24      **PRESIDING COMMISSIONER FISHER:**  Okay.  So

25  you said you dropped out of school after the tenth

26  grade, is that right?

27      **INMATE LUTHER:**  Yes, Ma'am.

18

1        **PRESIDING COMMISSIONER FISHER:**  Okay.  Why?

2        **INMATE LUTHER:**  Work.

3        **PRESIDING COMMISSIONER FISHER:**  What did you

4   go to work doing?

5        **INMATE LUTHER:**  Construction.

6        **PRESIDING COMMISSIONER FISHER:**  Okay.  And

7   why at that age did you make that decision?  What

8   were you, 16?

9        **INMATE LUTHER:**  Approximately, yes.

10       **PRESIDING COMMISSIONER FISHER:**  Okay.  Why

11  did you decide to do that?

12       **INMATE LUTHER:**  At the time, I worked for my

13  father in commercial high-rise construction.

14  During the summers, he taught me how to sheetrock

15  and tape and frame and everything, you know, that

16  I felt I needed to know to survive, you know.  And

17  so I didn't feel that school had anything more to

18  offer me and so therefore, I dropped out and you

19  know, I had a few other problems at school, you

20  know, that made my decision a little more easy.

21       **PRESIDING COMMISSIONER FISHER:**  What year

22  was that?

23       **INMATE LUTHER:**  I think it was like 1980,

24  right around there.

25       **PRESIDING COMMISSIONER FISHER:**  Okay.  And

26  then a couple years later, you enlisted?

27       **INMATE LUTHER:**  Yes.

19

1        **PRESIDING COMMISSIONER FISHER:**  Okay.  And

2  it says that you received an honorable discharge

3  after three months because -- for medical reasons.

4  Is that right?

5        **INMATE LUTHER:**  Yes.

6        **PRESIDING COMMISSIONER FISHER:**  Okay.  Were

7  you raised by both parents?

8        **INMATE LUTHER:**  Yes.

9        **PRESIDING COMMISSIONER FISHER:**  It talks

10  about your dad in here but not your mom.  And your

11  dad is still alive?

12        **INMATE LUTHER:**  Yes, Ma'am.

13        **PRESIDING COMMISSIONER FISHER:**  Okay.  The

14  psych report that I'm looking at is from '01, so

15  some of this is probably outdated.  What about

16  your mom, is she alive?

17        **INMATE LUTHER:**  Yes, Ma'am.

18        **PRESIDING COMMISSIONER FISHER:**  And are they

19  still married to each other?

20        **INMATE LUTHER:**  Yes, Ma'am.

21        **PRESIDING COMMISSIONER FISHER:**  Okay.  I

22  know I saw a letter in your file from a brother.

23  I'm not sure if I saw any other siblings.  Do you

24  have other siblings?

25        **INMATE LUTHER:**  I have three sisters.  I

26  have no brothers.

27        **PRESIDING COMMISSIONER FISHER:**  You have no

20

1    brothers, okay.  It must have been a sister then.

2    But I saw something regarding my brother and I was

3    thinking that it was a brother.  And are you still

4    currently married?

5           INMATE LUTHER:  Yes, Ma'am.

6           PRESIDING COMMISSIONER FISHER:  But you've

7    been separated for a while.  Is that right?

8           INMATE LUTHER:  Yes, Ma'am.

9           PRESIDING COMMISSIONER FISHER:  You got

10   married in 1986?  I just need for you to speak up

11   a little bit.  You got married in 1986?

12          INMATE LUTHER:  Yes.  Yes, Ma'am.

13          PRESIDING COMMISSIONER FISHER:  Okay.  It

14   says here that you have three adult-age children.

15   Are they your children biologically?

16          INMATE LUTHER:  No, they're by marriage.

17          PRESIDING COMMISSIONER FISHER:  Okay.  Your

18   wife's children.  It says that you -- At this

19   time, it said that you hadn't had communication

20   with them for quite a while.

21          INMATE LUTHER:  Yeah, that's correct.

22          PRESIDING COMMISSIONER FISHER:  Okay.  And

23   what about your wife?  Are you still in contact

24   with her?

25          INMATE LUTHER:  I haven't heard from her in

26   approximately three years.

27          PRESIDING COMMISSIONER FISHER:  Okay.  All

21

1  right.  Tell me about your substance abuse

2  history.  It sounds like you've tried several

3  different things.

4          INMATE LUTHER:  Yes, Ma'am.

5          PRESIDING COMMISSIONER FISHER:  What was

6  your substance of choice?

7          INMATE LUTHER:  Cocaine.

8          PRESIDING COMMISSIONER FISHER:  Cocaine.  Is

9  that what you were doing at the time of this

10  offense?

11          INMATE LUTHER:  Yes, Ma'am.

12          PRESIDING COMMISSIONER FISHER:  All right.

13  And how were you using it?  Were you snorting it?

14          INMATE LUTHER:  Yes, Ma'am.

15          PRESIDING COMMISSIONER FISHER:  Okay.  And

16  how often?

17          INMATE LUTHER:  A lot.

18          PRESIDING COMMISSIONER FISHER:  Everyday?

19          INMATE LUTHER:  At least.

20          PRESIDING COMMISSIONER FISHER:  Multiple

21  times a day?

22          INMATE LUTHER:  Yes, Ma'am.

23          PRESIDING COMMISSIONER FISHER:  How much do

24  you think you were spending on it?

25          INMATE LUTHER:  I don't know.  I have no

26  idea.

27          PRESIDING COMMISSIONER FISHER:  Okay.  What

22

1    about alcohol?  It says alcohol and marijuana

2    also.  It says you used marijuana for about eight

3    years.

4            INMATE LUTHER:  Yes, Ma'am.

5            PRESIDING COMMISSIONER FISHER:  Was that

6    during the same time as when you were doing coke?

7            INMATE LUTHER:  Yes, Ma'am.

8            PRESIDING COMMISSIONER FISHER:  Okay.  What

9    about alcohol?

10           INMATE LUTHER:  Same.

11           PRESIDING COMMISSIONER FISHER:  Okay.  All

12   right.  Is there anything else about your life

13   prior to coming to prison for this offense that

14   you think that we should know about that we

15   haven't talked about?

16           INMATE LUTHER:  I don't know other than, you

17   know, maybe some of the bad stuff I did.  Yeah,

18   you know there's -- not everything I did was, you

19   know, against the law, you know.  I mean, you

20   know, there are a lot of things that I did that

21   were positive, you know.  My family, to their

22   credit, did a lot for me.  You know they tried to

23   get me involved in AA earlier in my life and

24   unfortunately, I didn't see any benefits of it,

25   you know.

26           PRESIDING COMMISSIONER FISHER:  Your dad was

27   an alcoholic, wasn't he?

23

1    **INMATE LUTHER:**  Yeah, he's been sober 30

2    years now.

3    **PRESIDING COMMISSIONER FISHER:**  Okay.  And

4    you were -- It says in here that you were involved

5    in Teen-anon.

6    **INMATE LUTHER:**  Ala-teen.  Yes, Ma'am.

7    **PRESIDING COMMISSIONER FISHER:**  As far as

8    your priors as a juvenile, you had a theft and

9    receiving stolen property in 1980.  And then '81,

10   you had throwing a substance at vehicles, which it

11   says was dismissed.  And as far as adult

12   convictions, the one in '83 was related to

13   substances.  It says that you got 30 days in jail

14   and 36 months summary probation.  Is that right?

15   **INMATE LUTHER:**  Yes, Ma'am.

16   **PRESIDING COMMISSIONER FISHER:**  Okay.  And

17   then you had one in '85.  That was fighting in a

18   public place.  Is that right?

19   **INMATE LUTHER:**  Yes, Ma'am.

20   **PRESIDING COMMISSIONER FISHER:**  What was

21   going on with that?

22   **INMATE LUTHER:**  A lady that I knew was being

23   harassed by another man, and I tried to intervene

24   and it led to a fight.

25   **PRESIDING COMMISSIONER FISHER:**  Okay.  Had

26   you been using drugs that day?

27   **INMATE LUTHER:**  No, Ma'am.

24

1    **PRESIDING COMMISSIONER FISHER:**  Okay.  So

2    that wasn't --

3    **INMATE LUTHER:**  I might have been drinking,

4    but I don't believe I was using drugs.

5    **PRESIDING COMMISSIONER FISHER:**  Okay.  Let's

6    talk about your parole plans.  I didn't see it in

7    the Board report but I know you have several

8    letters.  So tell me, would you be living with

9    your parents?

10   **INMATE LUTHER:**  Depending on if I'm paroled

11   to my -- the county where I committed my offense

12   then I have two offers from there.  My oldest

13   sister in Aptos and another man and his wife that

14   I know that own their own company in Santa Cruz

15   have offered me a place to stay and a job.

16   **PRESIDING COMMISSIONER FISHER:**  And would

17   you try to get your parole out of state to Nevada?

18   **INMATE LUTHER:**  Yes, I would.

19   **PRESIDING COMMISSIONER FISHER:**  Is that what

20   you would prefer to do?

21   **INMATE LUTHER:**  Yes, I would.

22   **PRESIDING COMMISSIONER FISHER:**  Okay.  Let

23   me tell you what I have in the way of letters.  I

24   have a letter here from Jenny Ball.  Is that an --

25   That's an aunt, right?

26   **INMATE LUTHER:**  That's my aunt.

27   **PRESIDING COMMISSIONER FISHER:**  Okay.  She

1   says -- She's in Nevada.  And she talks basically

2   about what you've done while you're been in

3   prison.  It says that she and her husband would

4   give you all of the support that they could when

5   you're released.  I also have a letter here, I

6   believe it's from your -- I'm not sure if it's

7   written by your mom or your dad but it's signed by

8   both of them.  No, maybe not.  I think it's just

9   by your dad, Kenneth Luther.

10          **INMATE LUTHER:**  Yes.

11          **PRESIDING COMMISSIONER FISHER:**  Okay.  He

12  says, his mother and I both offer a place to live

13  until he's able to support himself.  I'm retired

14  and still -- I'm not sure what that word is, but

15  something about he does handyman work, right?

16          **INMATE LUTHER:**  Yeah, he does personal home

17  remodeling in Nevada.

18          **PRESIDING COMMISSIONER FISHER:**  Okay.  And

19  he says you could work with him.  This is a copy.

20  And I have one from your mom.  Is she Billie?

21          **INMATE LUTHER:**  Yes, Ma'am.

22          **PRESIDING COMMISSIONER FISHER:**  Billie

23  Luther, okay.  And she -- Her letter is about two

24  and a half pages long and she talks a lot about

25  what you've been doing while you've been in prison

26  to rehabilitate yourself and talks about the fact

27  that your dad is a member of Alcoholics Anonymous.

```
 1   And says that she's grateful to hear you accept
 2   full responsibilities -- full responsibility for
 3   your actions.  I have one here from Eugene, it
 4   looks like, is it Bertoni (phonetic)?
 5           INMATE LUTHER:  Yes, Ma'am.
 6           PRESIDING COMMISSIONER FISHER:  Okay.  I
 7   guess his wife wrote to you while you were in
 8   prison.  Is he an older man?
 9           INMATE LUTHER:  Yes, Ma'am.
10           PRESIDING COMMISSIONER FISHER:  Okay.  It
11   looks like it from his handwriting.  It talks
12   about being a member of AA and this is just
13   generally a supportive letter.  It talks about why
14   it would be important for you to participate in AA
15   and help other people if you were to be released.
16   And then I have one here from Jack and Karen
17   Benson.  It says that they're friends of your
18   family.  They're willing to offer Kenny a
19   temporary place to live.
20           "We can also offer temporary
21           employment in our masonry
22           construction business in Santa Cruz.
23           We have 24 years of recovering the
24           Twelve Step Program, so we can offer
25           support in staying alcohol and drug-
26           free."
27   And then I have one here from your sister, Tracy.
```

27

1   Let me just double-check this.   Tracy Ann Luther

2   Hernandez.   And she says:

3          "If consideration is given to Kenny

4          being paroled out of the area, I know

5          that my parents, Ken and Billie

6          Luther, are willing to help him with

7          a place to live, assistance in

8          acquiring employment, and financial

9          assistance, as well as supporting him

10          to continue living a sober life."

11   And in general, her letter is just you know very

12   supportive.   And she says that she believes that

13   you would not reoffend.   Is there anything else

14   that I should have that I haven't mentioned

15   regarding your parole plans?

16          **INMATE LUTHER:**   My oldest sister, Carrie, I

17   don't know if her letter is -- if she sent a new

18   letter or not, but she is also one of the other

19   options I have in Santa Cruz County.

20          **PRESIDING COMMISSIONER FISHER:**   Okay.   I

21   don't have it here.   If she sent one before, it's

22   probably in your Central File.

23          **INMATE LUTHER:**   Yes, Ma'am.

24          **PRESIDING COMMISSIONER FISHER:**   All right.

25   Is there anything else at all about parole plans

26   that we need to cover or have we pretty much

27   covered it?

28

1          INMATE LUTHER:  (Indiscernible).

2          PRESIDING COMMISSIONER FISHER:  Then if

3    you'll turn your attention to Commissioner Harmon,

4    he's going to go through your program with you.

5          DEPUTY COMMISSIONER HARMON:  Yes, hello,

6    Mr. Luther.

7          INMATE LUTHER:  Good day.

8          DEPUTY COMMISSIONER HARMON:  Listen

9    carefully.  What we're going to do is make sure

10   that the record is correct.  If it's inaccurate,

11   then we need to correct it, okay, so let me know.

12   It does show that your last hearing was February

13   14th of 2002.  At that time, you received a three-

14   year denial.  That represented subsequent hearing

15   number one.  You were received at CTF August 4th,

16   1989, from Folsom State Prison.  Your current

17   custody level is Medium A with a revised class

18   score of 19.  Does that sound right?

19         INMATE LUTHER:  Yes, Sir.

20         DEPUTY COMMISSIONER HARMON:  Okay.  I'm

21   going to take parts of your counselor's report.

22   Not all of it, like I said parts, and we're going

23   to kind of focus on the period of time since your

24   last hearing.  And this is from Counselor Ellison.

25   It shows from the period of December 1st of '01, to

26   December 1st of '02, he says that you remained at

27   CTF and housed in the general population and

29

1    Medium A custody.  It notes that you were assigned

2    as a computer-refurbishing tech receiving

3    exceptional grades based on various chronos.

4    Let's see, there was no -- let's see.  You

5    received numerous chronos for your participation

6    in AA during this period.  There was no psych

7    treatment, no negative discipline.  And then from

8    December of '02 to December of '03, everything

9    remains the same, CTF general population, Medium A

10   custody.  You were assigned as a computer-

11   refurbishing technician receiving exceptional

12   grades based on various chronos.  And it says on

13   August 26th of '03, you were unassigned due to the

14   program being indefinitely suspended.  And on

15   October 31st of '03, you were reassigned to the

16   vocational print shop.  It says received chronos

17   once again for your participation -- continuing

18   participation in AA.  No psych treatment, no

19   negative discipline.  And from December of '03 to

20   October 29th of '04, CTF general population, Medium

21   A custody.  It says you remained assigned to the

22   vocational print shop receiving satisfactory

23   grades based on various chronos.  And then it says

24   on June 23rd of '04, Luther received a certificate

25   of completion in vocational computer refurbishing,

26   and you received a 128(b) dated June 23rd of '04,

27   for your excellent work performance.  And it talks

1  about you continuing with the Twelve Step Program,

2  AA.   There was no psychiatric treatment, no

3  negative discipline.  And that brings us up into

4  October 29th of '04, and here we are in May '05, so

5  a number of months have gone by, about seven

6  months or whatever, six months since that was

7  written, and I don't have any addendum at this

8  point.  Can you kind of bring us up to date during

9  the last say six months?  What have you been

10 doing?

11      **INMATE LUTHER:**  I'm still assigned to the

12 print shop.  I mean as far as what I do in my life

13 in here or?

14      **DEPUTY COMMISSIONER HARMON:**  Yeah, what have

15 you been doing in the last six months?  What does

16 your day consist of?

17      **INMATE LUTHER:**  My hobby.  I make boats.  My

18 father I think sent a picture in.  He talks about

19 it in one of his letters.  I play a lot of sports.

20 I stay active.  I'm always trying to learn

21 something.  Right now it's Spanish I'm trying to

22 learn.  I'm trying to learn some stuff about

23 accounting, you know.  But mainly sports and hobby

24 and work is what I have time for.

25      **DEPUTY COMMISSIONER HARMON:**  And your

26 current assignment is?

27      **INMATE LUTHER:**  The vocational print shop.

31

1       **DEPUTY COMMISSIONER HARMON:**  Okay.  Because

2   I was looking at that earlier and I was trying to

3   figure out whether or not you completed that.

4       **INMATE LUTHER:**  No.  I will be done with

5   that approximately -- probably around the end of

6   the year.

7       **DEPUTY COMMISSIONER HARMON:**  Okay.  We

8   talked about the vocation, the computer

9   refurbishing program and then I found mention in

10  there of you having taken a course or something in

11  lead abatement?

12      **INMATE LUTHER:**  Lead abatement, no.  No, I

13  was the -- part of my job was to take care of the

14  tools, so I had to have hazardous materials and

15  training in that, but no lead abatement.

16      **DEPUTY COMMISSIONER HARMON:**  Thank you.

17  Some of the other work programs that you

18  participated in over the years included but are

19  not limited to -- I see you've been involved with

20  building maintenance, culinary, textiles.  You've

21  been in the inmate assignment office, clerical.

22  You've been a library worker, day labor.  We've

23  talked about you've had good work reports.  You've

24  stayed busy throughout your incarceration.  You

25  received your GED and your high school diploma and

26  then completed a two-year general study college

27  program through Hartnell College in '94, and you

32

1    graduated Magna Cum Laude, right?

2        **INMATE LUTHER:**  Yes, Sir.

3        **DEPUTY COMMISSIONER HARMON:**  Self-help and

4    group programs, you've been in AA now for how many

5    years?

6        **INMATE LUTHER:**  Approximately 16 years.

7        **DEPUTY COMMISSIONER HARMON:**  About 16 years

8    and I'm assuming you know all Twelve Steps?

9        **INMATE LUTHER:**  Yes.  That's while I've been

10   incarcerated.  I was a member of AA on the streets

11   also.

12       **DEPUTY COMMISSIONER HARMON:**  And what about

13   the -- How have you worked through the Eighth and

14   Ninth Steps?

15       **INMATE LUTHER:**  I've written letters.  I've

16   talked to my own family, you know.  Whenever

17   possible, you know, I try to do as much as I can,

18   you know.  And it's ongoing because even today

19   sometimes I will remember stuff that I've done

20   that I didn't know, you know.  And it was only

21   because somebody had asked me about something and

22   because of a conversation we had about something I

23   had done, and so it's an ongoing process that I go

24   through daily, you know.  I'm not necessarily on

25   any one Step.  I seem to have to work several

26   Steps a day.  You know every time I make a

27   decision of what I'm going to do with my life as

33

1  far as going forward, I have to, you know, I have

2  to do my own Fourth Step, you know.  Eighth and

3  Ninth Step is the same thing, you know.  Some

4  stuff is more in need of attention than others,

5  you know.  You can't always make amends for

6  bumping into somebody or something.  You can say

7  you're sorry but you know there's more important

8  stuff that I have to look at.

9        **DEPUTY COMMISSIONER HARMON:**  Okay.  You've

10  had four 115s.

11        **INMATE LUTHER:**  Yes, Sir.

12        **DEPUTY COMMISSIONER HARMON:**  The last one

13  was November 9th, 1990, for failure to perform, I

14  guess, your job.  It was in textiles at the time.

15  And you've had eight 128s, the last one October

16  28th of 2001.  There's been no violence or weapons

17  and of course, there's been no serious

18  disciplinaries since 1990 and that is commendable

19  and I want to point that out.  I think that's

20  important.  And like I said, there's been eight

21  128s and the last one was October 28th of '01, for

22  failure to follow a direct order.  What do you

23  think happened after November 9th of 1990, that led

24  up to no more 115s?

25        **INMATE LUTHER:**  No more drugs.

26        **DEPUTY COMMISSIONER HARMON:**  Were you using

27  in the institution?

34

1          **INMATE LUTHER:**  Prior to my arrival here I

2     was.  Nothing extensive.  It was one of them, like

3     I don't know what you would call it.  It wasn't

4     anything that -- I'm trying to figure out how I

5     could explain this because I really can't because

6     it was another stupid thing, you know.  And that's

7     what made me change.  It really -- It was a hard

8     time and I thought that what I was doing was

9     something that I wanted to do when I was being

10    forced into doing something I didn't want to do by

11    somebody, another person.  I don't know if you

12    know what prison used to be like years and years

13    ago.  It was a lot different especially at Old

14    Folsom, and I fell into a situation.  It wasn't

15    drugs.  It was alcohol.  Somebody gave me some and

16    I took a drink, and as soon as I did it, I knew

17    that I was wrong, you know.

18          **DEPUTY COMMISSIONER HARMON:**  Is that about

19    pruno?

20          **INMATE LUTHER:**  Yeah.  Yeah.  And just as

21    soon as I did it, the overwhelming feeling I had

22    was just something that I haven't forgotten.  It

23    was -- I don't know.  It was just -- So ever since

24    then, I've been really conscience about being

25    around people and that kind of environment.

26          **DEPUTY COMMISSIONER HARMON:**  Okay.  How have

27    we done?  Have we covered most of your

35

1    accomplishments?

2           **INMATE LUTHER:**  Yes, Sir.

3           **DEPUTY COMMISSIONER HARMON:**  I should point

4    out that I did find also in '91 you did the Life

5    Skills Group.

6           **INMATE LUTHER:**  Yes, Sir.

7           **DEPUTY COMMISSIONER HARMON:**  And you were at

8    one point were a MAC Representative?

9           **INMATE LUTHER:**  Yes, Sir.

10          **DEPUTY COMMISSIONER HARMON:**  You know in the

11   area of self-help and group, that's kind of weak.

12   Am I missing -- Am I missing things?  Have you

13   done anything else in those areas in terms of

14   Anger Management or anything?

15          **INMATE LUTHER:**  I have taken Anger

16   Management, two classes.

17          **DEPUTY COMMISSIONER HARMON:**  And where was

18   that at?

19          **INMATE LUTHER:**  Here.

20          **DEPUTY COMMISSIONER HARMON:**  I didn't find

21   your certificate.

22          **INMATE LUTHER:**  It was overseen by Doctor

23   Bakemann.

24          **DEPUTY COMMISSIONER HARMON:**  Do you remember

25   what year?

26          **INMATE LUTHER:**  I believe it was like '95,

27   '94, '95, after the change here.

36

1          **DEPUTY COMMISSIONER HARMON:**  How about

2     anything in the last say, the last six or seven

3     years?  I mean --

4          **INMATE LUTHER:**  No, Sir.

5          **DEPUTY COMMISSIONER HARMON:**  Are you in

6     Central?

7          **INMATE LUTHER:**  Yes, Sir.

8          **DEPUTY COMMISSIONER HARMON:**  Have you looked

9     at Project Change.  Have you looked into that?

10         **INMATE LUTHER:**  I've looked into a couple,

11    the Impact, and the other -- There's a couple of

12    other programs they have here and they keep saying

13    we'll put you on the waiting list, but you know

14    I'm still waiting.

15         **DEPUTY COMMISSIONER HARMON:**  Let's say the

16    programs never come.  What are you going to do

17    about it though?  I mean is there any -- Do you do

18    any self-study in terms of learning about behavior

19    especially your own?

20         **INMATE LUTHER:**  Well, AA.  I mean, you know.

21         **DEPUTY COMMISSIONER HARMON:**  How about the

22    library?  Do you ever check out books and go into

23    those areas?

24         **INMATE LUTHER:**  No.  No.  I mean as far as

25    psychology or stuff like that?

26         **DEPUTY COMMISSIONER HARMON:**  No, things that

27    maybe you'd get a better understanding of

37

1    yourself.  In other words, things that might

2    address issues of why you were motivated to commit

3    this crime?

4         **INMATE LUTHER:**  I have a pretty good idea

5    and that was drugs.  That's why I don't do them

6    anymore because they make me a different person

7    than what I really am.  As long as I don't do

8    them, I know that I can be the person that I

9    should be.

10        **DEPUTY COMMISSIONER HARMON:**  Okay.  And

11   let's see here.  I think we've covered that all

12   pretty well.  Okay.  We have a doctor's report.

13   It's not a current report, and it's a fairly

14   supportive report.  It's from (indiscernible)

15   Reed, Joe Reed.  You probably heard that at your

16   last hearing.  I'll take parts of it again.  A lot

17   of it is repetitive.  And under Clinical

18   Assessment under Current Mental Status and

19   Treatment Needs, the doctor wrote at the time,

20   speaking of you it says:

21            "During the clinical interview,

22            Inmate Luther was alert and oriented

23            to person, place, and time.  His mood

24            and affect were within normal limits,

25            and his behavior was appropriate to

26            the setting.  No evidence of a mood

27            or a thought disorder was

38

1          demonstrated.  His estimated level of

2          intellectual functioning was within

3          the average range."

4    He comes up with at the time under Current

5    Diagnostic Impressions with AXIS I:  Poly

6    Substance Abuse in sustained full remission in a

7    controlled environment.  Under Review of the Life

8    Crime in part:

9          "He admitted responsibility for the

10         death of the victim.  He stated that

11         he has a very poor memory of the

12         crime secondary to his heavy

13         intoxication.  However, he does

14         remember stealing a stereo from the

15         victim's girlfriend's car and

16         shooting the victim who was chasing

17         him after taking the stereo.  The

18         inmate did show empathy toward damage

19         done to the victims and he seemed

20         genuinely penitent for his crime."

21   Assessment of Dangerousness in part:

22         "That within a controlled setting,

23         violence potential is considered to

24         be below average relative to this

25         Level Two inmate population.  And if

26         released to the community, the

27         violence potential is considered to

39

1           be no more than that of the average

2           citizen in the community."

3   The doctor goes on here, substance abuse is a risk

4   factor, which may be a precursor to violence for

5   this individual.  Under Clinical Observations,

6   Comments and Recommendations in part he wrote:

7           "This inmate does not have a mental

8           health disorder, which would

9           necessitate treatment either during

10          his incarceration period or following

11          upon parole."

12  And that was from Joe Reed.  And it seems like

13  just a few months before in May '01, you had a

14  report also.  That was from Martha Carswell.  Do

15  you remember that one?

16          INMATE LUTHER:  No.

17          DEPUTY COMMISSIONER HARMON:  Maybe it's the

18  wrong guy.  I know it says Luther, D-98605?

19          INMATE LUTHER:  Wrong Luther.

20          DEPUTY COMMISSIONER HARMON:  Is that the

21  wrong Luther?

22          INMATE LUTHER:  Yes, Sir.

23          DEPUTY COMMISSIONER HARMON:  Amazingly, it's

24  a very similar report.

25          ATTORNEY FOX:  CDC.

26          DEPUTY COMMISSIONER HARMON:  So the prior

27  one -- The one in '97 from Bakemann sound right?

40

1          **INMATE LUTHER:**  Bakemann, yes, Sir.

2          **DEPUTY COMMISSIONER HARMON:**  Is that the

3    prior report?

4          **INMATE LUTHER:**  Yes, Sir.

5          **DEPUTY COMMISSIONER HARMON:**  Okay.  And

6    Doctor Bakemann, and for the transcriber that's

7    B-A-K-E-M-A double N, and at the time he said that

8    his insight and judgment seems to be improving

9    over that of his earlier years.  And under AXIS I,

10   he comes up with Poly Substance Abuse in

11   institutional remission and Adult Antisocial

12   Behavior.  Under AXIS II, he put no contributory

13   personality disorder.  And he says under

14   psychiatric conclusions, his diagnosis of

15   psychopathology appears to be indirectly related

16   to the offense.  Certainly, his use of drugs may

17   have been a contributing factor but did not

18   directly determine what he did on that night.

19   That's all I want to report on his report.  So

20   what I've done there is I've taken parts of the

21   most recent two reports from the doctors.  I've

22   taken parts of your counselor's report and I've

23   taken parts of your institutional adjustment.  I

24   may have inadvertently left out areas that are

25   very important to you.  I'm going to return to the

26   Chair here but before I do, is there anything that

27   you wish to add to any of those areas?

1    **INMATE LUTHER:**  No, Sir.

2    **DEPUTY COMMISSIONER HARMON:**  I'll return to

3    the Chair.

4    **PRESIDING COMMISSIONER FISHER:**  Thank you.

5    I just have a couple of questions for you

6    specifically about the gun.  And I asked you

7    before where you got it and you said that you had

8    stolen it.  Did you carry a gun all the time?

9    **INMATE LUTHER:**  No.  No, Ma'am.

10    **DEPUTY COMMISSIONER HARMON:**  Why did you

11    (indiscernible) that night?

12    **INMATE LUTHER:**  When I went out that night,

13    my intention was not to go steal anything.  I was

14    only leaving the apartment where I was I staying

15    with a friend of mine because him and his

16    girlfriend were messing around.  And it was a one-

17    room apartment and we were this close and I didn't

18    want to be there.  So I just grabbed my jacket and

19    I left.  And I had been trying to sell that

20    weapon.  I really didn't want it.  Yeah, I knew

21    better than to be carrying a gun.  And that night

22    I had been showing somebody the weapon and just

23    when I grabbed my jacket, it was in there, you

24    know.

25    **PRESIDING COMMISSIONER FISHER:**  If you knew

26    better than to be carrying a gun, why would you

27    carry it loaded?

42

1       **INMATE LUTHER:**  As I had stated before, the
2    gentleman that I had showed that weapon to that
3    night wanted to see if it fired because according
4    to him they jammed a lot, that type of weapon.
5       **PRESIDING COMMISSIONER FISHER:**  So why
6    didn't you unload it after that?
7       **INMATE LUTHER:**  Just habit, you know.  I
8    mean not as far as -- as far as I didn't carry it
9    like I was carrying it because I wanted to use it
10   loaded.  It was just -- I don't know.  It just --
11   It happened that way I guess.  I don't know.  I
12   mean I can't tell you exactly, you know.  I mean
13   that whole -- that whole week I think I had that
14   weapon like two weeks.  And the whole time in
15   Santa Cruz and I think there were several other
16   people that had talked about it in my trial that
17   they had looked at it, you know.  That they knew I
18   had it and their response was the same thing, you
19   know, that they didn't want a gun, you know.  And
20   so that, you know, like I said, I don't know how I
21   could explain that it would be loaded because just
22   it was, you know.  I mean I don't know why I did
23   it, you know.
24      **PRESIDING COMMISSIONER FISHER:**  And I saw
25   they found a screwdriver in the area?
26      **INMATE LUTHER:**  Yes, Ma'am.
27      **PRESIDING COMMISSIONER FISHER:**  There was

43

1  something about a knife, too.  Is that where they

2  found the knife (indiscernible)?

3        **INMATE LUTHER:**  No, they found the knife in

4  the car.

5        **PRESIDING COMMISSIONER FISHER:**  Okay.  And a

6  beer can?

7        **INMATE LUTHER:**  Yes, Ma'am.

8        **PRESIDING COMMISSIONER FISHER:**  Okay.  All

9  right.  So you weren't carrying the knife on you

10  at the time.

11        **INMATE LUTHER:**  What do you mean?

12        **PRESIDING COMMISSIONER FISHER:**  You didn't

13  have -- Did you have the knife on you?

14        **INMATE LUTHER:**  When I ran?

15        **PRESIDING COMMISSIONER FISHER:**  Uh-hmm.

16        **INMATE LUTHER:**  No, Ma'am.

17        **PRESIDING COMMISSIONER FISHER:**  Okay.  All

18  right.  So you said that you thought that you were

19  firing into a bank, a dirt bank?

20        **INMATE LUTHER:**  Yes, Ma'am.  That was my

21  intention.

22        **PRESIDING COMMISSIONER FISHER:**  Okay.  I

23  know the Commissioner asked at your last hearing

24  how close Joseph was to you and you said that you

25  didn't remember but that you had heard or that you

26  read in the reports.

27        **INMATE LUTHER:**  During the trial, they

44

1  stated a distance that they had come up with.  I

2  don't know how close he was.  Like I said, I had

3  no idea I had even shot him.  All I know is after

4  I fired the weapon that he wasn't chasing me

5  anymore and I got up and continued running.  And I

6  didn't know until the next morning, until the

7  officer knocked on the door.

8      PRESIDING COMMISSIONER FISHER:  How many

9  shots did you fire?

10     INMATE LUTHER:  I believe two.  They say

11 three.  I don't -- I'm not going to dispute

12 anything about that, you know.  I mean, as I said,

13 you know what I did was a very terrible act, you

14 know.

15     PRESIDING COMMISSIONER FISHER:  Okay.  Any

16 questions?

17     DEPUTY COMMISSIONER HARMON:  Yeah, for

18 clarification.  Has your story changed over time?

19     INMATE LUTHER:  No.

20     DEPUTY COMMISSIONER HARMON:  I'm reading the

21 -- excuse me, just a second.

22     [Thereupon, the tape was turned over.]

23     DEPUTY COMMISSIONER HARMON:  I'm reading the

24 old report.  I'm on page four of the probation

25 officer's report (indiscernible) is?

26     INMATE LUTHER:  Yeah.

27     DEPUTY COMMISSIONER HARMON:  Anyway, it says

45

1   here that -- The report indicates the defendant,

2   meaning you, says that he was tackled and knocked

3   to the ground.  During the struggle, the gun

4   simple went off.  Is that correct?

5       INMATE LUTHER:  No, that's his words.

6       DEPUTY COMMISSIONER HARMON:  Let me ask you

7   this because I'm having trouble following some of

8   this story.  You were out there in the process of

9   stealing this particular stereo out of the car at

10  the time.

11      INMATE LUTHER:  Yes, Sir.

12      DEPUTY COMMISSIONER HARMON:  Okay.  We're

13  you inside -- We're you inside the car when this

14  young man came out and found you?

15      INMATE LUTHER:  Yeah, I was inside the

16  vehicle, yes.

17      DEPUTY COMMISSIONER HARMON:  Okay.  Did he -

18  - Did he approach you and --

19      INMATE LUTHER:  No.  No.  If I would have

20  stayed where I was at, he never would have known I

21  was there because when he came out, he didn't come

22  out because he heard me.  I was in the Jeep and he

23  was going to his vehicle, which was in front of

24  the Jeep.  And if I would have stayed where I was

25  at, he would have got in his car and left.  But

26  because I took off running, he heard me.  And

27  that's when he heard me open the door on the Jeep.

46

1    And when I ran down the street, that's how he

2    heard me is when I took off.

3        **DEPUTY COMMISSIONER HARMON:**  Okay.  So you

4    take off running and then what does he do?  Does

5    he take off running after you?

6        **INMATE LUTHER:**  Yes, Sir.

7        **DEPUTY COMMISSIONER HARMON:**  Is he saying

8    anything to you?

9        **INMATE LUTHER:**  There was some stuff

10   exchanged.  I don't know exactly what it was, you

11   know.  I mean it was -- if I -- When I think about

12   it at the time, I believe it sounded like, you

13   know, I'm going to get you, stop, stop, you know,

14   or get off my property, at first I think is what

15   it was.  But then there was some other stuff said,

16   you know, and I even told him, I said, I got a

17   gun, I got a gun, you know, trying to scare him

18   away.  And he just kept chasing me and that's when

19   I figured well, I'll pull it out and I'll fire it

20   here, you know and --

21       **DEPUTY COMMISSIONER HARMON:**  So how far did

22   he chase you before he caught you?

23       **INMATE LUTHER:**  At the time I didn't know

24   until later.  I had no idea of distance.  They say

25   about a quarter mile.

26       **DEPUTY COMMISSIONER HARMON:**  That's what I

27   kind of gathered, too.  Now because of your -- You

47

1    seemed to be suffering from some type of memory

2    lapses or something from this crime.

3         **INMATE LUTHER:**  No, I just know what

4    happened from a specific point exactly what

5    happened, you know, because everything happened so

6    fast.  I don't -- Like I said, I know I intended

7    to fire the weapon.  Now I didn't mean to fire it

8    in his direction and that's why I don't know if he

9    ran into me.  He may not have.  I may have tripped

10   over my own feet.  I may -- All I know is that as

11   I was going down to the ground, I fired that gun.

12        **DEPUTY COMMISSIONER HARMON:**  Did you -- Do

13   you believe that any of your lack of memory or

14   whatever is due to any of the drugs or alcohol you

15   consumed that day or night?

16        **INMATE LUTHER:**  I don't know.  I don't know.

17        **DEPUTY COMMISSIONER HARMON:**  Do you believe

18   any of the substances that you took are

19   responsible for you not being able to remember any

20   of this or the parts that you don't remember?

21        **INMATE LUTHER:**  I don't know.  I mean I'm

22   not a doctor so I don't know the affects totally.

23   I know how -- I can attest to my own feeling as

24   how I felt when I did cocaine.

25        **DEPUTY COMMISSIONER HARMON:**  Well, let me

26   tell you why because I worry about things like

27   selective memory because I read this, the little

1    time I've had with it, and I know that you were

2    attempting to remove a stereo from a car.  And I

3    also know that you were able to run from the scene

4    a quarter of a mile.  I also know that you were

5    able to pull a gun and use the gun.  My problem is

6    I don't really understand why you can't remember

7    it from A to Z.

8         INMATE LUTHER:  What do you mean?

9         DEPUTY COMMISSIONER HARMON:  Just exactly

10   what I said.  I don't understand why you can't

11   remember everything that was said.

12        INMATE LUTHER:  I'm not saying that I don't

13   remember what happened.  I'm saying I don't know

14   what happened because of -- from me being in the

15   Jeep and running down the street, and whether or

16   not he either ran into me or me trip over my own

17   feet.  Now what happened there, why I went to the

18   ground, I don't know.  That's what I'm saying is I

19   don't know what happened there.  I know I fired

20   the gun.  As far as how many times I fired it,

21   like I said, I don't know if it was two or three

22   times, you know.  When I -- I've thought about it

23   a lot.  I've gone over it in my head a lot about

24   what happened, you know.  I didn't even know the

25   next day when I was asked about it that I was up

26   on the bank where the gun wasn't where the

27   screwdriver was.  Now whether or not that was a

49

1   result of what happened when I fired the gun and

2   everything that happened there, I don't know, you

3   know.  Like I said, I can't explain, you know.  I

4   mean --

5        **DEPUTY COMMISSIONER HARMON:**  That's just it.

6   I'm just curious why you can't explain it.  But

7   you know, I want you to understand something,

8   Mr. Luther, you're not on trial here.  The DA's

9   already done their job.  I'm simply here for

10   clarification, so I do not intend to cross-examine

11   you or allow anyone else to do that in that sense.

12   But I have been doing this in one form or another

13   for 37 years and I consider myself to be, you

14   know, pretty astute to a lot of the things that go

15   on.  And when I here drugs or alcohol being

16   brought into the scene of a crime, I just like to

17   know exactly what happened if you can understand

18   that.  Okay?

19        **INMATE LUTHER:**  Yes, Sir.

20        **DEPUTY COMMISSIONER HARMON:**  So that's all I

21   have and I'll return to the Chair.

22        **PRESIDING COMMISSIONER FISHER:**  Thank you.

23   Do you have any questions?

24        **DEPUTY DISTRICT ATTORNEY ROWLAND:**  Yes.

25   Thank you.

26        **PRESIDING COMMISSIONER FISHER:**  I just want

27   to remind you to answer to me.  Okay.  She'll ask

1    the questions through me.

2          **INMATE LUTHER:**  Yes, Ma'am.

3          **DEPUTY DISTRICT ATTORNEY ROWLAND:**  Chairman,

4    I would like you to ask the inmate how he can

5    explain that there were no abrasions to either

6    himself, his hands, and there were no abrasions to

7    Joe Vomvolakis, either his hands, his neck, or his

8    knees if in fact Mr. Vomvolakis was running full

9    speed to catch up with him and then tackled him?

10          **INMATE LUTHER:**  I have no answer.  I mean

11   I'm not here to argue anything about what happened

12   back then.  We went all through this in the trial.

13   As I said before, I went to trial, you know.  I

14   went in front of jury and I have no --

15          **PRESIDING COMMISSIONER FISHER:**  It's all

16   right.  You've answered the question.  Do you have

17   anything else?

18          **DEPUTY DISTRICT ATTORNEY ROWLAND:**  Yes.  I'm

19   also wondering if he had in fact been using

20   cocaine, marijuana, and drinking heavily for two

21   to three days before the murder, why he did not

22   tell the police that when he was interviewed?

23   Because in fact he told the police that he had

24   maybe a 12-pack of beer during the day but that he

25   wasn't affected by it.

26          **PRESIDING COMMISSIONER FISHER:**  Okay.  Is

27   that -- First of all, had --

51

1        **INMATE LUTHER:**  That's not true.

2        **PRESIDING COMMISSIONER FISHER:**  Hold on.

3    First of all, had you been using drugs, cocaine,

4    alcohol, and marijuana for an extended period of

5    time before?

6        **INMATE LUTHER:**  Yes, Ma'am.

7        **PRESIDING COMMISSIONER FISHER:**  Okay.  What

8    did you tell the police?

9        **INMATE LUTHER:**  They did a toxicology report

10    and you can look it up.  It's in --

11        **PRESIDING COMMISSIONER FISHER:**  Okay.  But

12    what did you tell them?

13        **INMATE LUTHER:**  They said that they knew.

14    They knew that I had been doing drugs and alcohol

15    prior to that.

16        **PRESIDING COMMISSIONER FISHER:**  Did you tell

17    them that you hadn't?

18        **INMATE LUTHER:**  No.

19        **PRESIDING COMMISSIONER FISHER:**  Go ahead.

20        **DEPUTY DISTRICT ATTORNEY ROWLAND:**  I'm

21    wondering why it was that when he was in jail

22    initially after his arrest, why he called a friend

23    to have a friend dispose of the .357 Magnum that

24    was another gun he'd stolen if there was something

25    that he was trying to conceal about what he's done

26    with that gun, which was his interest in having a

27    friend dispose of it?

52

1          PRESIDING COMMISSIONER FISHER:  Is that

2    correct?

3          INMATE LUTHER:  No.  The part of me calling

4    a friend, yes.  But that was only because the

5    weapon was on his property and I didn't want him

6    or somebody to find it that shouldn't have found

7    it, you know.  So he did what he had to do with

8    it.

9          PRESIDING COMMISSIONER FISHER:  Okay.  And

10   it was a gun that you had stolen?

11         INMATE LUTHER:  Yes, Ma'am.

12         PRESIDING COMMISSIONER FISHER:  Why was it

13   on his property?

14         INMATE LUTHER:  Because it was the day after

15   -- the morning I found out that I had shot and

16   killed Joseph Vomvolakis.  I had taken some stuff,

17   that weapon and some stereo parts and dumped them

18   so they wouldn't be at the person's house that I

19   was staying at, so he wouldn't get in trouble if

20   something happened.

21         PRESIDING COMMISSIONER FISHER:  Was that the

22   gun that you had used to shoot Joseph?

23         INMATE LUTHER:  No.  No, Ma'am.

24         PRESIDING COMMISSIONER FISHER:  All right.

25         DEPUTY DISTRICT ATTORNEY ROWLAND:  And how

26   would the inmate explain hitting Joe two out of

27   the three times a shot was fired?  There were

53

1    three casings found in close proximity to

2    Mr. Vomvolakis' body.  How would he explain

3    hitting him two out of those three times if he

4    intended to fire at a dirt bank.

5         **INMATE LUTHER:**  I can't.  I can't.

6         **DEPUTY DISTRICT ATTORNEY ROWLAND:**  And in

7    this letter that I was given by Ms. Fox today that

8    was written, a (indiscernible) date apparently by

9    the inmate.  He indicated that if he had known

10   that he had hurt Joe that he would have stopped.

11   And my question is how could he say he would have

12   helped him when in fact his description is largely

13   that there was a struggle, so he would have

14   actually shot him in very close physical proximity

15   to himself and he clearly didn't stay?

16        **INMATE LUTHER:**  Is she stating that I said

17   there was a struggle?  I'm not saying there was a

18   struggle, you know.  Like I said in the letter

19   that I wrote, I never had any intention to shoot

20   him, you know.  I don't like using the words bad

21   luck, but that's what it was.  I mean I just --

22   I'm still to this day -- I don't how I did this.

23        **PRESIDING COMMISSIONER FISHER:**  That's okay.

24   Anything else?

25        **DEPUTY COMMISSIONER HARMON:**  And he

26   indicated today, the inmate did, that all he knew

27   was he fired the gun and then Joe stopped chasing

54

1    him.  So my question is, if he didn't realize he

2    had shot him, then how would he have explained

3    that Joe stopped chasing him?

4        **INMATE LUTHER:**  I figured that if he wasn't

5    there -- he wasn't chasing me anymore, he stopped,

6    then I had frightened him away.

7        **PRESIDING COMMISSIONER FISHER:**  Is that it?

8        **DEPUTY DISTRICT ATTORNEY ROWLAND:**  One other

9    question if I may just have a moment.  He

10   indicated today that it was pure stupidity that he

11   was carrying a gun.  And there was evidence at the

12   trial that in fact a couple of weeks previously,

13   he'd been up at a lake and had told a young woman

14   at that lake that he had the gun and now guys who

15   had bothered him at an earlier time at that lake

16   wouldn't bother him anymore because he had a gun.

17   And I'm wondering how he can explain that

18   statement when he just described that carrying it

19   on that night was stupid?

20       **PRESIDING COMMISSIONER FISHER:**  Do you

21   understand that question?

22       **INMATE LUTHER:**  I know what she's talking

23   about.  Let me clarify.  First of all, the person

24   I was talking to was a nine-year-old boy.  And my

25   original reasoning for being out on the lake, we

26   were in a canoe and I took that weapon with me

27   because I was going to throw it in the lake.  And

1  he had the same question, why do you have a gun.

2  I said, well, people in Santa Cruz -- There's a

3  few people that don't like me and I felt like I

4  had to protect myself.  And I stated to him the

5  same thing, I don't really like guns and I should

6  get rid of it.  More or less, I was bragging to

7  him, you know, to a nine-year-old kid.

8      **PRESIDING COMMISSIONER FISHER:**  Why didn't

9  you throw it in the lake?

10     **INMATE LUTHER:**  I don't know.  Something,

11 something made me change my mind.  I don't know

12 what it was.  Maybe it was the potential money

13 that I could have got for drugs, you know.  I saw

14 it as money, you know.

15     **DEPUTY DISTRICT ATTORNEY ROWLAND:**  In

16 response to a question by yourself, Commissioner,

17 the inmate said that the statement in the

18 probation report that Joe Vomvolakis tackled him.

19 And I just want to make sure I understood the

20 inmate's answer is that that's not correct that he

21 said that?

22     **ATTORNEY FOX:**  I think that speaks for

23 itself.

24     **PRESIDING COMMISSIONER FISHER:**  Yeah, I

25 think what he said several times is that he's not

26 sure.  He's not sure if he fell or if Joe ran into

27 him.  Is that correct?

56

1          INMATE LUTHER:  Yes, Ma'am.

2          PRESIDING COMMISSIONER FISHER:  I have no

3    other questions.

4          PRESIDING COMMISSIONER FISHER:  All right.

5    Counsel?

6          ATTORNEY FOX:  No questions.

7          PRESIDING COMMISSIONER FISHER:  All right.

8    Would you like to close?

9          DEPUTY DISTRICT ATTORNEY ROWLAND:  Yes.  I'm

10   sorry.  It's awkward for me to do it sitting down.

11   When I was reviewing this file, I started with the

12   Sheriff's Department case file and then I reviewed

13   the documents in my file, and there were a number

14   of things I found very striking.  The first is, as

15   yourself, Mr. Harmon, mentioned, that there has

16   been an evolution in the sequence of events of

17   that night.  I didn't intend to shoot him.  I

18   intended to fire at the bank and now actually

19   moments ago he said he did intend to fire the

20   weapon.  When people aren't being honest, when

21   they aren't being sincere, there is a categoric

22   inability to be inconsistent, excuse me, to be

23   consistent.  Everybody knows that.  And one of the

24   difficulties and one of the things that struck me

25   significantly when I reviewed things is that there

26   have been these consistent statements in these

27   psych reports that in fact he's remorseful for

57

1    what he's done and he's taken responsibility for
2    what he's done.  I honestly can't understand how
3    his conduct could be characterized that way when
4    he can't even tell a consistent story about what
5    took place.  And the truth is the various
6    incarnations of his version of the events of that
7    evening are categorically inconsistent with the
8    physical evidence.  It would be one thing perhaps
9    if this were a question of witness testimony about
10   what happened.  There weren't any witnesses to
11   what happened that night.  All of the information
12   that was presented to the jury before they
13   convicted him of second-degree murder was physical
14   evidence.  Testimony about where Joe's body was.
15   Testimony about the location of three casings that
16   were very close to his body.  Testimony about the
17   relative distance that those shots must have been
18   fired from a distance of anywhere between two and
19   10 feet was the testimony by Doctor Mason.  There
20   were no contact injuries.  Those shots were not
21   fired in close physical proximity to Joe
22   Vomvolakis.  It just didn't happen.  The statement
23   today that he indicated that in fact that Joe
24   wouldn't have known he was in the Jeep but for the
25   fact that he ran.  The testimony at the trial was
26   very clear.  Joe initially, the first thing he
27   said that folks from Stacey Hine's home heard was

58

1    get off my property.  At that point, they heard
2    steps.  Within five to ten seconds thereafter they
3    heard three shots or pops.  That sequence of
4    events again is categorically inconsistent with
5    what he would have you believe today about what
6    happened.  Now as Deputy Commissioner Harmon
7    stated at the beginning, or excuse me it may have
8    been yourself Commissioner Fisher, that the issue
9    today is whether or not the inmate places an
10   unreasonable risk of danger to the community.  If
11   you actually haven't been either sufficiently
12   honest with yourself or sufficiently introspective
13   with yourself about what you have done, how could
14   anybody have any measure of security that you
15   wouldn't do it again.  You cannot take
16   responsibility for what you've done if you cannot
17   admit it.  For whatever reason, the inmate has
18   chosen to believe that he didn't mean to shot,
19   that he didn't mean to hit him, that the gun went
20   off as he was falling down.  Well, that sure
21   doesn't explain three shots.  It sure doesn't
22   explain two out of the three hitting someone and
23   each of which locations would have been fatal.  It
24   doesn't explain the distances.  He hasn't taken
25   responsibility.  And one thing, I don't know
26   actually how common it is, but as I was reading
27   these various reports from one of Doctor

1   Bakemann's, he did two, but the one dated 7/11,

2   excuse me.  The one dated 11/26/01, excuse me, by

3   I guess Doctor Reed, it states if released to the

4   community, his violence potential is considered to

5   be no more than that of the average citizen in the

6   community.  As a citizen in the community and I

7   assume these folks as well as citizens of the

8   community, I find that shocking.  I quite frankly

9   find it offensive.  We've never shot a gun.

10  Actually, I have at Quantico.  Short of that, I've

11  never shot a gun in anger.  I've never shot a gun

12  in fear.  I've never directed a weapon of any sort

13  at anybody.  I am representative of the community.

14  I'm horrified to believe that whomever Joe Reed is

15  would find the defendant similarly, excuse me, the

16  inmate similarly representative of the community

17  and would feel it appropriate to describe myself

18  and him in the same sentence.  I'm not safe with

19  him out, not personally.  I'm just saying as a

20  member of this community, nobody can be assured

21  that he or she is safe because he cannot assure

22  anyone that any one of us is safe.  I indicated in

23  my letter that the District Attorney's Office

24  strongly opposes his release and I would urge in a

25  respectful way that I don't see how this

26  Commission could consider his release at this time

27  absent a very candid statement about what he did,

1    and why you should believe that having done that

2    he won't do it again. And that hasn't taken place

3    to date in 19 years and it hasn't taken place

4    today. I would also note one thing that was

5    striking again to me. When asked by the Sheriff's

6    Department detectives investigating the case if

7    the victim was responsible for what happened, the

8    inmate said that the victim shouldn't have chased

9    him. That if the victim hadn't chased him, this

10   wouldn't have happened. He went on to say if he

11   hadn't been carrying a gun this wouldn't have

12   happened either. Anyone who could cast any degree

13   of responsibility or blame on somebody else and

14   that person has chosen to fire a gun three times

15   obviously in the direction of that person is

16   somebody who isn't ready or isn't able to be out

17   in a generalized community. It was nobody else's

18   series of decisions that the inmate made on that

19   night that put himself in this position. He chose

20   to steal that gun. He chose to steal a .357

21   Magnum. He chose to keep them with him for a

22   period in excess of two weeks. He chose to have

23   somebody fire the gun earlier on the day of the

24   murder. He then chose to reload. He chose to

25   leave the house with the gun that night. He

26   didn't not know it was in his jacket. Guns are no

27   small things. While a .25 caliber gun is

61

```
 1    certainly smaller that say a .357 Magnum, it is
 2    still the approximate size of a Walkman and weighs
 3    about a pound and a half.  You know if something
 4    of that size and that weight is in your pocket.
 5    He chose to go and break into a Jeep.  He chose
 6    apparently to drink beer in the Jeep.  He chose to
 7    leave his knife there.  He chose to run when he
 8    was directed to get out of the Jeep instead of
 9    sitting there and frankly taking responsibility
10    for the fairly modest crime of trying to steal an
11    equalizer.  When he chose to run, he then chose to
12    turn and fire a gun no fewer than three times.  He
13    then chose to leave.  He then chose when he was
14    initially contacted by the police to deny
15    everything, to deny having been present, to deny
16    having heard shots, to deny he was ever near the
17    Jeep until he was confronted with his fingerprints
18    that were found in the Jeep.  Then his story began
19    to evolve further to the incarnation that you
20    heard some of which today.  Each of those
21    decisions was made exclusively by him.  And I do
22    think that it is significant that at the time when
23    he was questioned by the Sheriff's Department
24    detectives he made absolutely no mention
25    whatsoever of any narcotic substances.  And in
26    fact as it related to alcohol, that he did say
27    that he had been drinking.  He said that it didn't
```

1    affect him and it didn't affect his memory of the

2    events of that evening, so that he could not have

3    done something that evening that he wouldn't

4    remember.  Until I think you can assure yourselves

5    that this won't happen again, I don't think he can

6    be released and I think you have a plethora of

7    information before you to make that decision.  I

8    thank you very much for your consideration and the

9    opportunity to speak.

10           **PRESIDING COMMISSIONER FISHER:**  Ms. Fox.

11           **ATTORNEY FOX:**  Thank you.  We respectfully

12    disagree with my colleague from Santa Clara (sic).

13    Mr. Luther should be found suitable for parole

14    because he does not pose an unreasonable risk of

15    harm to the community.  Turning to the reports of

16    the people who have observed him for a lengthy

17    number of years including the Board report, which

18    is supportive of release, there are a number of

19    laudatory chronos, which are documents that

20    describe contributions that the prisoner during

21    his incarceration at the institution.  He has

22    never had a violent 115, which is a disciplinary

23    write-up.  His last custodial counseling chrono,

24    which is a report of minor discrepancies from the

25    rules of the prison, was in 2001.  Again, nothing

26    of violence in his record in prison.  In contrast

27    to that, the writers consistently say through the

63

```
 1   years that he's made a positive productive use of
 2   his time.  And in fact, he has upgraded
 3   educationally and vocationally to the extent
 4   available in prison, in fact, recently having
 5   obtained a certificate of completion and it seems
 6   that another one will be attained by the end of
 7   the year.  So he has upgraded educationally and
 8   vocationally, which are two things that are
 9   requested.  Turning to the psychological
10   evaluations, I wouldn't be so arrogant as to
11   substitute my opinions for those of a number of
12   licensed, trained professionals who do nothing but
13   write these psychological evaluations for inmates.
14   The most current one, which is some aged, is
15   supportive, is very supportive and takes into
16   account the accomplishments Mr. Luther has made
17   over the last several years.  Turning to his
18   parole plans, Mr. Luther has two good sets.  One
19   in the county of commitment, but the Board is
20   permitted to parole an inmate to another county if
21   that's something that would enhance his ability to
22   successfully discharge or perform on parole.  He's
23   a good worker.  The chronos, which are the little
24   reports, are in the file showing that.  Turning to
25   the crime of commitment, I won't go over the
26   details.  I think it's too painful for you.  There
27   is a great loss here.  It can't be replaced.  If
```

64

1    Mr. Luther could turn the pages of the calendar

2    back, he would and things would be different, but

3    we can't do that.  All we can do is look forward

4    and move ahead.  He does have and has demonstrated

5    great insight and that's consistently observed by

6    the clinicians who have tested him.  He says he

7    wants to be the person that I should be and he's

8    demonstrated that over the years in prison.  Prior

9    to coming here and committing -- or committing the

10   crime that brought him here, there wasn't that

11   sort of violence in his life.  It may be true that

12   most people don't handle firearms on a regular

13   basis and perhaps that's a good thing, but he did

14   have two firearms and did fire the shots that day.

15   He has not minimized his culpability.  His memory

16   of the events, I think he has stated to the best

17   of his ability.  He's not being evasive.  He's not

18   giving excuses.  In fact, he was under the

19   influence, drugs, alcohol, fear, adrenaline.

20   They're not excuses.  They were substances that

21   were there and a horrible price was paid, but we

22   can't go back again and change that day.  For

23   those reasons, Mr. Luther would have you find him

24   suitable for parole and set a date, which would

25   allow him time to get the plans together.  If

26   there is a need for delving into insight, which I

27   disagree that there is based on the clinicians

65

1    reports, that specific area could be studied prior

2    to his release.  So I'll submit saying that he

3    should be found suitable because he would not pose

4    an unreasonable risk of harm to the community

5    unless Mr. Luther has comments he'd like to share.

6         INMATE LUTHER:  I've, you know, over the

7    years and obviously I've had a lot of time to

8    think about my actions, the way I used to be.

9    Obviously, I've done a lot, you know, to improve

10   myself.  Every time that I get ready to come to a

11   Board, I try to think of, you know, what to say,

12   you know.  When I get here, it's like I go blank

13   sometimes, you know.  There's so much that I want

14   to say to the family.  It's hard in this venue

15   because of being able to say stuff to them face-

16   to-face, but overall, regardless of what I've

17   done, I really am sorry.

18        PRESIDING COMMISSIONER FISHER:  Is there

19   anything else?

20        INMATE LUTHER:  No.

21        PRESIDING COMMISSIONER FISHER:  All right.

22   You're going to be speaking.  Is that right?  All

23   right.  What I'm going to ask you to do before you

24   make your statement is just to state your name

25   again for the transcriber and then go ahead.

26        MR. CHRIS VOMVOLAKIS:  I'm Chris Vomvolakis,

27   last name V-O-M-V-O-L-A-K-I-S.

66

1          **PRESIDING COMMISSIONER FISHER:**   Okay.   Go

2     ahead.

3          **MR. CHRIS VOMVOLAKIS:**   All right.   Well,

4     good afternoon to everyone in the room and I'd

5     like everybody to listen.   What I'm going to say

6     is a lot of coming from me.   It doesn't represent

7     the view of my parents.   And by the way, I'm so

8     proud of them for being here today.   This is

9     absolutely heart wrenching for them.   And I don't

10    think any of us should have to go through this but

11    19 years on we're going through it and it just is.

12    I'll tell you what I've wrestled with for the last

13    19 years is that the challenge for me, where Ken

14    has had to be in here, this is his reality, my

15    reality has been painful.   But the course I've

16    followed as I've really, really reflected on this

17    for the last maybe year or so, I found that I came

18    to this place of healing in my heart.   I had to

19    let go of what happened.   In a sense I think we've

20    talked to JC, we've talked about some people

21    called restorative justice, some people call it

22    forgiveness.   But there's this thing that rose up

23    in me that just said you can't be stuck in what

24    happened on May 10th, 1986, because it was killing

25    me.   It was killing them.   So what this has taught

26    me for the last 19 years, this arc of time that we

27    all share, is that all that's changed is my

67

```
 1    perspective, what I once thought he did, the worse
 2    terrible nightmare I could ever imagine and I
 3    lived it for about 14 years.  Then I met my
 4    partner here, and we fought through this and it's
 5    been a lot of work, a lot of work.  You have no
 6    idea how much work.  Ken there has spent 6,948
 7    days in here, in incarceration.  Well, I don't
 8    want to get caught up today about what was said
 9    because if I start getting caught up again on
10    details and facts and this and that, I'm going to
11    go back into my insanity that I believe I had.  I
12    believe he read my letter.  Let me just remind you
13    of something I said in there, and I wrote this and
14    I want Ken to know that I wrote this May 1st three
15    weeks ago today, is that I wrote in one of the
16    paragraphs he's never ever expressed remorse,
17    accepted responsibility, or taken an apology out.
18    Then about an hour ago, two hours ago now, this
19    letter appeared.  I don't know what the letter
20    said.  I think it was written a couple of years
21    ago, but at this point it's just inconsequential.
22    I don't even want to read the letter at this point
23    because what I have to hold onto is that for Ken,
24    for them, for you is that all I can hope for is
25    that we all heal from this experience and we move
26    on.  Now I don't see him.  I don't want to be
27    friends with him.  I don't want to be enemies with
```

1   him.  I don't want anything for anybody accept for

2   us to heal from this experience.  Now what he's

3   done in here is a path that he's created.  It's

4   his path.  I can't be concerned with that path

5   anymore and a heart of vengeance and all that sort

6   of stuff.  I'm not a religious person.  I consider

7   myself to be a spiritual person.  But at this

8   point, the only thing that I want is healing out

9   of this experience.  His choices that he made,

10  they can be perceived as good, as bad.  I've

11  written down a few things here.  He talked about

12  accepting full responsibility.  I've never heard

13  that from him.  All I can do at this point is hope

14  that he recovers from this experience and that my

15  parents recover from this.  What healing for them

16  may be is that they put all their energy into

17  throwing him -- throwing away the key because

18  that's what they want.  Throw away the key and

19  they'd be happy.  Maybe mine is doing the work

20  that I've done to heal myself and for her to put

21  up with me with this.  But he said, bad luck.  He

22  said, great insight, and I heard a lot of, I don't

23  know, which if I get caught up in that, that kind

24  of disappoints me.  But I don't care what you do

25  with his time.  I don't care.  I'm not going to

26  advocate that he stays in here.  I'm not going to

27  recommend that he's freed.  I don't care.  All I

69

1   can say is that it's taken all of your time.

2   You're just seeing us three at the end of a 19-

3   year cycle because 19 years ago I'd be bawling.

4   I'd be on the floor bawling in a puddle.  But I

5   guess between whatever agreement Joe and Ken had

6   all those years ago, it's played out this way.

7   And I've go to tell you I'm a better person for

8   it.  It's been a tough road.  You have no idea how

9   tough it's been, but I serve myself, my county, my

10  spirit.  I serve it better and I've got to thank

11  my brother for his gift.  A lot of people are

12  praying for us today.  A lot of people are giving

13  us really good vibes.  And I've got to tell you I

14  don't see anything separate from you guys, or you,

15  or you, or you.  It's all just -- We're all made

16  up of the same thing.  And I'm not going to see

17  things as good and bad.  I'm just not going to see

18  things that way anymore.  I've just got to believe

19  that there's a path we're following and we're all

20  going to meet there at the end.  And that's as

21  (indiscernible) as I'm going to get.  And guess

22  what, (inaudible).  I'm done.  Thank you for

23  listening.

24          **PRESIDING COMMISSIONER FISHER:**  All right.

25  Are either of you going to speak?  No.  All right.

26          **MR. CHRIS VOMVOLAKIS:**  I'm sorry.

27          **PRESIDING COMMISSIONER FISHER:**  I was just

70

1  checking to see if either of your parents --

2      **MR. CHRIS VOMVOLAKIS:**  Would you like to say

3  anything?

4      **PRESIDING COMMISSIONER FISHER:**  We're going

5  to go ahead and recess.

6                    **R E C E S S**

7                    --o0o--

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

71

1    CALIFORNIA BOARD OF PRISON TERMS

2    D E C I S I O N

3    **PRESIDING COMMISSIONER FISHER:**  All right.  I

4    want to note for the record that everyone who was

5    previously in the room and identified themselves

6    have returned to the room.  Mr. Luther, the Panel

7    reviewed all of the information received from the

8    public and relied on the following circumstances

9    in concluding that you're not yet suitable for

10   parole and would pose an unreasonable risk of

11   danger to society or a threat to public safety if

12   released from prison.  Certainly, the first thing

13   that we considered was the commitment offense.

14   This was the murder of Joseph Vomvolakis.  And the

15   motive for this crime was just incredibly trivial.

16   It was to avoid being caught stealing a car

17   stereo.  This was a young man who Mr. Luther

18   didn't know and who wasn't doing anything wrong.

19   He walked out of his girlfriend's apartment and

20   encountered Mr. Luther engaged in criminal

21   activity and as a result of that he lost his life.

22   Mr. Luther does not have a significant criminal

23   history.  He has a juvenile arrest for theft.

24   There was a vandalism.  It was throwing water

25   balloons.  And as an adult, his most significant

26   conviction would have been for possession of

27   **KENNETH LUTHER   D-55450   DECISION PAGE 1    5/23/05**

72

1    marijuana.  It was noted in the probation

2    officer's report that it was several pounds.  He

3    certainly failed to profit from society's previous

4    attempts to correct his criminality and those

5    attempts would include juvenile probation, county

6    jail, and adult probation.  He has an unstable

7    social history, which includes the prior criminal

8    behavior that I spoke of, and also he was a high

9    school dropout and he was abusing substances.

10   While he's been incarcerated, Mr. Luther has

11   programmed in a somewhat limited manner.  He has

12   not yet sufficiently participated in beneficial

13   self-help programs.  He's had eight 128(a)

14   counseling chronos, the last one back in October

15   of '01, and four 115 disciplinary reports, the

16   last one in November of 1990.  The psychological

17   evaluation dated 11/30/01, authored by Doctor Reed

18   is favorable.  And he has good parole plans and

19   seems to have very good family support.  The

20   Hearing Panel notes that in response to 3042

21   Notices, the District Attorney of Santa Cruz

22   County had a representative here today who spoke

23   in opposition to a finding of suitability at this

24   time.  We also have letters from family members of

25   the victim indicating an opposition to a finding

26   of suitability.  The Panel finds that the prisoner

27   **KENNETH LUTHER  D-55450  DECISION PAGE 2   5/23/05**

73

1    needs to continue to participate in self-help in

2    order to understand and cope with stress in a non-

3    destructive manner, also in order to gain insight

4    into the commitment offense and the factors that

5    led to this offense.  Nevertheless, we do want to

6    commend you, Mr. Luther, for the work that you've

7    been doing.  Certainly, the fact that you've had

8    no 115s since 1990 is commendable.  You completed

9    vocational computer refurbishing in '04.  You've

10   gotten -- been getting excellent work reports in

11   print shop and you've spent 16 years while

12   incarcerated in AA.  I know that you mentioned

13   that you'd been in it on the street as well.

14   However, currently the positive aspects of

15   behavior do not yet outweigh the factors of

16   unsuitability.  In a separate decision, the

17   Hearing Panel finds that the prisoner's been

18   convicted of murder and it's not reasonable to

19   expect that parole would be granted at a hearing

20   during the next two years.  The specific reasons

21   for this finding are as follows, first of all once

22   again, this commit offense.  The murder of a young

23   man in order to avoid being caught stealing a car

24   stereo is just an incredibly trivial reason for

25   someone to lose their life in such a violent way.

26   Also the prisoner has a history of unstable

27   **KENNETH LUTHER   D-55450   DECISION PAGE 3   5/23/05**

74

1  relationships that involved his criminal behavior
2  as I noted earlier, his substance abuse and the
3  fact that he dropped out of high school at about
4  the age of 16.  And he's not yet completed the
5  necessary programming that's essential to his
6  adjustment and needs additional time to gain that
7  programming and that would be in the areas of
8  self-help.  And that's what we recommend to
9  you, Mr. Luther, is to continue to remain
10  disciplinary-free, continue your good work
11  program, but also to get involved in some more
12  self-help apart from substance abuse programming
13  that can help you gain some insight.  There
14  frankly I have to echo what Commissioner Harmon
15  said about -- It troubles me when there is a
16  conveniently located memory lapse and that seems
17  to be the case here.  So I'd just like to see you
18  do a little bit of work on developing some
19  insight.  And that completes the reading of
20  the decision.  Do you have any comments,
21  Commissioner?
22      **DEPUTY COMMISSIONER HARMON:**  I don't think
23  there's anything else I can add at this point
24  other than to wish you luck, sir.
25      **INMATE LUTHER:**  Thank you.
26      **PRESIDING COMMISSIONER FISHER:**  Thank you.
27  **KENNETH LUTHER  D-55450  DECISION PAGE 4   5/23/05**

75

1    That completes the hearing.  It's approximately

2    5:15.

3                           --o0o--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    PAROLE DENIED TWO YEARS

24    THIS DECISION WILL BE FINAL ON Sep. 20, 2005

25    YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26    DATE, THE DECISION IS MODIFIED.

27    KENNETH LUTHER  D-55450  DECISION PAGE 5   5/23/05

76

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, TAMYRA MORGAN, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 75, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of KENNETH LUTHER, CDC No. D-55450, on MAY 23, 2005, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated June 1, 2005, at Sacramento County, California.

Tamyra Morgan
Transcriber
CAPITOL ELECTRONIC REPORTING